(No. 13679.—Decree affirmed.)

PAUL CALAME, Appellant, *vs.* GEORGE W. PAISLEY,·
Appellee.

*Opinion filed February 15, 1921—Rehearing denied April 8, 1921.*

1. LEASES—*when instrument will be regarded as a lease and not an option.* An instrument purporting on its face to be a lease of the right to mine coal, and which is treated as a lease for many years by the parties thereto, will be regarded as a lease and not a mere option.

2. SAME—*equity will not enforce forfeiture of a lease.* A court of equity will not interfere on behalf of the party entitled to enforce the forfeiture of a lease but will leave him to his legal remedies, if there be any, even though the case might be one in which no equitable relief would be given to the defaulting party against the forfeiture.

3. SAME—*what is not ground for canceling lease.* The fact that the lessee in a coal lease procures a corporation in which he is largely interested to develop the mine and do the work contemplated by the lease, without assigning the lease to the corporation, is not ground for canceling the lease after the lapse of nearly twenty years, during which time the lessor and those succeeding to his title have treated the lease as in force and permitted the lessee to pay the taxes on the coal rights for many years, and where none of the parties were under any disability during such period.

APPEAL from the Circuit Court of Montgomery county; the Hon. THOMAS M. JETT, Judge, presiding.

LANE, DRYER & BROWN, for appellant.

MILLER & MAJOR, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

Appellant, Paul Calame, filed a bill in the circuit court of Montgomery county to quiet title to eighty acres of land in said county and to cancel certain documents with reference to the land. A general demurrer filed by appellee was overruled and answer filed, and after the pleadings were settled the cause was heard before the chancellor and the

bill was dismissed for want of equity. The case was then appealed to this court.

The record shows that on September 18, 1891, John Durston, who then owned the said land, executed and acknowledged an agreement with appellee, George W. Paisley, called by appellant an option and by appellee a lease, with reference to mining and excavating coal and other minerals under the tract. On July 27, 1895, Durston and a number of other persons executed and delivered to appellee a certain extension agreement with reference to the same property and other property owned by the other signers of the agreement, extending the time in which the original agreement could be carried out to October 1, 1897, and with other conditions hereinafter referred to. Durston died intestate August 24, 1909, leaving his widow and six children surviving him as his only heirs-at-law. Thereafter the widow and five of these children executed deeds which placed in Chester A. Durston, the other child, the title to the eighty acres, and on January 13, 1913, Chester by warranty deed conveyed the land to appellant, the deed containing this provision: "This conveyance is made subject to a coal lease given to George W. Paisley, dated September 18, 1891, and recorded in miscellaneous record 5, at page 159." The agreement of September 18, 1891, heretofore referred to, between the appellee and John Durston, called Exhibit A, so far as it affects the questions here involved, reads as follows:

"This lease, made and entered into * * * between John Durston, * * * party of the first part, and George W. Paisley, * * * party of the second part, witnesseth: That the party of the first part, for and in consideration of one dollar to him * * * paid, * * * and in further consideration that party of the second part, his heirs * * * or assigns, shall sink or put in operation the coal shaft at or near the village of Witt, * * * have granted, demised and leased unto the party of the second part, his

heirs  *  *  *   and assigns, the sole and exclusive right of mining and excavating for coal and for drilling for petroleum or other valuable minerals or volatile substances, [describing the premises of complainant.]   Said party of the second part is to have the coal [under the north forty acres] free of all costs or royalty, and is to pay the said party of the first part for the coal [under the south forty acres of complainant's land] $30 per acre for said coal if the same is mined and removed from said premises. * * * To have and to hold said premises for the aforesaid purposes only, unto the said party of the second part, his heirs * * * and assigns, for the term of fifty years from date. It is further covenanted, and this lease is made on the express condition, that if the said party of the second part, his heirs * * * or assigns, shall not have a coal shaft open and ready for the hoisting of coal at the premises hereinbefore designated by October 1, 1896, then this lease shall be void and of no effect."

The extension agreement, called Exhibit B, executed on July 27, 1895, to appellee by John Durston and others, provided the coal shaft referred to in Exhibit A should be ready for hoisting coal on October 1, 1897, and that appellee, his heirs and assigns, should have machinery upon the ground and materials ready to begin work on sinking a shaft on or before November 1, 1895, and further provided with reference to Exhibit A that it was "hereby referred to for greater certainty and made a part of this agreement."

About the time of the execution of Exhibit A the Montgomery Coal Company was organized as a corporation in this State with appellee as one of the principal stockholders. About a quarter of a mile from the depot of the Big Four Railroad Company in the village of Witt, work on the sinking of a coal shaft was begun November 1, 1895, and coal was struck in said shaft on July 2, 1896, and was regularly hoisted from the mine from and after July 20,

1896. Machinery, consisting of a steam boiler and tim-
bers for erecting a derrick and curbing a shaft, was on
the ground about the shaft October 10, 1895. In the dig-
ging of this coal shaft the appellee was superintendent and
manager, and remained in that position with the Montgom-
ery Coal Company for a number of years thereafter and
until the shaft and mining rights were sold to Robert L.
Hammond. Appellee, at or about the time this shaft was
sunk, owned or had leases on a thousand or more acres of
coal lands abutting and contiguous to said eighty acres. As
superintendent of the Montgomery Coal Company he caused
the machinery to be put on the ground and the shaft to be
sunk for said mine ready for hoisting coal, as just stated.

It is a fair inference from the record, although not
very clearly or positively shown therein, that the work of
the Montgomery Coal Company in said shaft did not re-
sult in uncovering coal of the right character and condi-
tion and did not seem to justify the successful mining of
coal therein, and that the mine has not been successfully
operated since the opening of the shaft. It does appear,
however, that the coal rights for some thirteen or fourteen
years prior to the institution of this litigation were taxed
in the name of appellee and the taxes paid by him, amount-
ing during these years to approximately $170. The record
shows that appellant by *mesne* conveyances obtained the
title formerly held by John Durston, and the principal
question to be decided here is whether, under the proper
construction of Exhibits A and B, the trial court rightly
dismissed the bill for want of equity.

Counsel for appellant argue earnestly, citing numerous
authorities, that the agreement entered into by appellee and
John Durston should be construed as an option and not as
a lease; that in determining the real character of a con-
tract the court will look to its purpose rather than to the
name given it by the parties; (*Murch* v. *Wright,* 46 Ill.
487; *Lucas* v. *Campbell,* 88 id. 447;) that the principal

rule in construing a written instrument is to ascertain the
intention of the parties. (*McLean County Coal Co.* v. *City
of Bloomington,* 234 Ill. 90; 13 Corpus Juris, 521.)     In
discussing a somewhat similar contract in *Consolidated Coal
Co.* v. *Peers,* 150 Ill. 344, this court said (p. 348) : "It was
said by Chief Justice Gibson in *Walker* v. *Physic,* 5 Barr,
(Pa.) 193, that the great rule for the interpretation of
covenants is, to so expound them as to give effect to the
actual intent of the parties, collected, not from a single
clause, but from the entire context.    And in *Reniger* v. *Fo-
gossa,* Plowd. 18, it was said : 'The scope and end of every
matter is principally to be considered, and if the scope and
end of the matter be satisfied, then is the matter itself,
and the intent thereof, also satisfied.'    The doctrine of these
cases has been frequently affirmed by this court and an-
nounced in decisions too numerous to specify."    Exhibit B
refers specifically to Exhibit A and makes the same a part
thereof.    Without question, Exhibit A and Exhibit B
should be construed together in order to reach the true
intent of the parties.

We agree with counsel for appellant that in construing
a contract the real question to be decided is the intent of
the parties and not the terms that were used, as to whether
the instrument is a lease or an option.    The question
whether an instrument shall be held to be an option or a
lease is shown not to be always free from difficulty, in the
decisions cited and discussed on this question in James on
Option Contracts, sec. 113.    The interpretation which the
parties themselves put upon the contract may be of assist-
ance in determining its real meaning. (*Geithman* v. *Eich-
ler,* 265 Ill. 579.)    It is clear that when the original par-
ties to this contract entered into it they understood they
were signing a lease rather than a mere option, and when
Chester A. Durston, the son of the original grantor, con-
veyed this property to appellant by the deed executed in
1913, he stated therein that the conveyance was "made sub-

ject to a coal lease given to George W. Paisley, dated September 18, 1891, and recorded in miscellaneous record 5, at page 159." We think it is obvious that when the original contracts were entered into, the parties understood between themselves that they were conveying something more than a mere license to mine for coal and other minerals. As was said by this court in *Consolidated Coal Co.* v. *Peers, supra,* on page 350: "The law, as we understand it, is, that a lease of the right and privilege to mine or take away stone or coal from the lessor's·land is the grant of an interest in the land and not a mere license to take stone or coal."

It is conceded by counsel for appellant that if appellee had assigned his rights under the contract to the Montgomery Coal Company, that company, by the sinking of the shaft and work done, could be held to have complied with the provisions of the contract sufficiently to defeat appellant's efforts to recover under said bill, but it is insisted that as this was not done, the mere fact that appellee was the superintendent and principal stockholder in the Montgomery Coal Company at the time the work was done did not make the sinking of this shaft by that company a compliance by appellee with the terms of the contract; that a corporation represents its stockholders as to corporate affairs but not as to individual affairs. (14 Corpus Juris, 844.) The stipulated facts in this record show, beyond doubt, that many of the coal rights and much of the land in that vicinity formerly owned by appellee had been assigned or conveyed to the Montgomery Coal Company, but that he has never assigned his interest in this eighty acres of land to said company.

The chief reason of appellant for strenuously arguing that this contract is an option rather than a lease seems to be, that if it were held to be a lease appellant could not by bill in equity set it aside on the ground of forfeiture, as it is a settled and familiar doctrine that a court of

equity will not interfere on behalf of the party entitled thereto and enforce a forfeiture but will leave him to his legal remedies, if any there be, even though the case might be one in which no equitable relief would be given to the defaulting party against the forfeiture. 1 Pomeroy's Eq. Jur. (3d ed.) secs. 459, 460; *Tarr* v. *Stearman,* 264 Ill. 110.

The doctrine of estoppel is invoked by counsel for appellee to sustain the finding of the trial court in the decree. Exhibit A was executed September 18, 1891, and Exhibit B July 27, 1895. John Durston lived thirteen years after the coal shaft had been sunk by the Montgomery Coal Company on the land and after the provisions of the contract had been in effect, though not technically, complied with by appellee. His heirs thereafter conveyed this land to Chester A. Durston, who in 1913 conveyed the same to appellant subject to the coal lease, and neither Durston nor his heirs nor appellant made any claim that the agreement had not been complied with by appellee until some time in 1919,— practically six years after appellant had obtained a deed of the property. It seems obvious from the record before us as to these transfers and as to the action of the Montgomery Coal Company and appellee in connection with the sinking of the shaft and the payment of the taxes on the coal rights under this land for some thirteen or fourteen years before the filing of this bill, that all the parties understood that appellee had a lease to the coal rights in this land and had so complied therewith that he had not forfeited his rights under the agreement. This conclusion is supported by the reasoning in *McConnell* v. *Pierce,* 210 Ill. 627.

The decree of the trial court is further supported on the ground of *laches.* Appellant and his grantors stood by and allowed the appellee, whether acting for himself or the Montgomery Coal Company, to understand that it was conceded that he had complied with his original contract entered into September 18, 1891, and they allowed him to pay the taxes on the coal rights for many years and to

act in every way as if he were entitled to the coal rights in the eighty acres. For a period of practically nineteen years appellant and his grantors have slept on their rights as to forfeiting this contract and have failed on this record to give any satisfactory reason for the delay. Neither appellant nor his grantors were minors or non-residents or apparently under any disability to act promptly in attempting to enforce their demands under said contract. Under the reasoning of this court in *Castner* v. *Walrod*, 83 Ill. 171, and *Vermilion County Children's Home* v. *Varner*, 192 id. 594, we think this is a proper case in which to apply the rule that equity aids only the vigilant, and, even if that were the only reason, we think the bill was properly dismissed for want of equity.

The decree of the circuit court will be affirmed.

*Decree affirmed.*